# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CAROLE ASHTARI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 7746 |
| | ) | |
| GFS MARKETPLACE, LLC, | ) | Judge Rebecca R. Pallmeyer |
| GFS MARKETPLACE NORTH AMERICA, LLC, | ) | |
| GFS MARKETPLACE REALTY ONE, LLC, | ) | |
| GFS MARKETPLACE REALTY TWO, LLC, | ) | |
| GFS MARKETPLACE REALTY THREE, LLC, | ) | |
| GORDON FOOD SERVICE, INC., and | ) | |
| GORDON FOOD SERVICE, LLC, | ) | |
| | ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

On November 19, 2007, Plaintiff Carole Ashtari slipped and fell upon entering the GFS Marketplace Store located at 4101 Healthway Drive in Aurora, Illinois. Defendant GFS Marketplace, LLC, owned and operated the store, and Defendant GFS Marketplace Realty One, LLC, owned the building and land. It was raining on the afternoon in question, and Plaintiff alleges that Defendants were negligent in failing to remove a puddle of water that had formed on the vestibule floor of the store. On November 4, 2009, Plaintiff filed a negligence action in the Circuit Court of Cook County. Defendants removed this case to federal court pursuant to 28 U.S.C. §§ 1332 and 1441 and now seek summary judgment, citing a well-settled principle of Illinois law that no liability arises from natural accumulations of water tracked onto a business owner's premises. Plaintiff contends that even if the water was the result of a natural accumulation, Defendants remain liable because the tile in the vestibule was excessively slippery. Plaintiff retained Lloyd Sonenthal to render an expert opinion as to the condition of the vestibule tile at the time of her fall, and Defendants have moved to strike Plaintiff's expert report. For the following reasons, Defendants' motions are granted.

**FACTUAL BACKGROUND**

Plaintiff Carole Ashtari is a 62 year-old woman and a resident of Naperville, Illinois. (Am. Compl. ¶ 1.) Defendant Gordon Food Service, Inc. is a Michigan corporation with its principal place of business in Grand Rapids, Michigan. (Defs.' 56.1 ¶ 3.) Defendants GFS Marketplace, LLC, GFS Marketplace North America, LLC, GFS Marketplace Realty One, LLC, GFS Marketplace Realty Two, LLC, GFS Marketplace Realty Three, LLC, and Gordon Food Service, LLC, are limited liability corporations organized under the laws of Delaware, with their principal places of business also in Grand Rapids, Michigan. The GFS Aurora Marketplace Store is a retail store operated by GFS Marketplace, LLC.[1] (*Id.* ¶ 5.)

Ashtari entered the GFS Marketplace store sometime between 2:00 and 3:00 p.m. on November 19, 2007. (Ashtari Dep. 16, Ex. D to Def.'s 56.1.) The temperature was unusually warm and mild for November, but it was raining that afternoon. (*Id.* 16-17) At the entrance to the store, there were two sets of automatic sliding glass doors separated by a tile-floored vestibule. (Graf Dep. 12, Ex F to Def.'s 56.1.) At the time Ashtari entered the store, a mat lay flat on the vestibule floor about one foot from the entryway. (Brown Dep. 28, Ex. G to Defs.' 56.1.) As Plaintiff stepped into the vestibule, she slipped and fell hard onto the tile floor, breaking her left arm. (Ashtari Dep. 27, 29.) She does not recall noticing a puddle of water in the vestibule before her fall, but does remember seeing a fan in the vestibule once she was on the ground. (Ashtari Dep. 75; 86-87.)

At the time Plaintiff fell, Ronald Dean Brown, a GFS store employee, was gathering carts in the parking lot. (Ashtari Dep. 21; Brown Dep.14.) When he saw Plaintiff slide and fall, Brown

---

[1] As set out in detail in the Amended Notice of Removal, there is complete diversity between the parties here because no member of the Defendant limited liability corporations is a citizen of Illinois and the amount in controversy exceeds $75,000.00. There is no dispute that GFS Marketplace, LCC, operated the store and GFS Marketplace Realty One owned the building and the land. Plaintiff has not explained her basis for naming the other Defendants in this case, but Defendants have not moved to dismiss. As a result, the court will not grant summary judgment for Defendants on this ground alone, and will instead address the merits of the complaint.

left the carts and went to Plaintiff's assistance. (Brown Dep. 14, 33.) By the time he reached Ashtari, she was lying in the vestibule and was unable to move her left arm. (*Id.* 17.) Brown observed that the mat on the floor was also pushed away, with the edge rolled up to the point where Plaintiff had slid into it. (*Id.* 28-29.) Brown summoned another employee to call the store manager to the scene (*id.* 17), and Store Manager Melinda Graf directed an associate to call an ambulance. (Graf Dep. 43.) The ambulance transported Plaintiff from the Aurora store to Rush Copley Hospital, where she underwent surgery on her arm. (Ashtari Dep. 36, 39-40.)

According to Defendants, customers often track water onto the store floor when it rains or snows during the wintertime, and the GFS store typically uses an electric floor blower to dry any water in the vestibule area. (Defs.' 56.1 ¶ 10; White Dep. 7-17, Ex. E to Defs.' 56.1; Graf Dep. 22-25.) On the day of Plaintiff's accident, Graf and Brown both noticed that the floor in the vestibule was "slightly wet" from the rain (*id.* at 15), but they could not recall with certainty whether they knew the floor was wet before the incident, or only when they came to Plaintiff's assistance. (Graf Dep. 48; Brown Dep. 19.) Defendants do acknowledge, however, that carpeted mats were placed in the vestibule area at some point on the day of Plaintiff's accident, and a floor blower was set up to dry the mats as they became wet. (Defs.' Answers to Interrogs. 27, Ex. B to Defs.' 56.1.) After Plaintiff's accident, store employees set up a sign warning customers about the wet floor. (Graf Dep. 45, Brown Dep. 19.)

On November 4, 2009, Plaintiff filed a negligence action in the Circuit Court of Cook County, and Defendants removed the case to federal court based on diversity jurisdiction. Plaintiff's amended complaint alleges that Defendants (1) installed flooring in the vestibule area of the store that became dangerous and slippery when wet; (2) operated a fan in the vestibule area that caused water to accumulate unnaturally on the day of the accident; (3) failed to remove the accumulation of water that formed, despite knowing of the danger it posed to customers; and (4) failed to warn

3

customers that the store's flooring became slippery when wet.[2] (Am. Compl. ¶ 9.) On October 7, 2010, Defendants moved for summary judgment, arguing that Plaintiff presented no evidence that Defendants had caused or aggravated the natural accumulation of water on the vestibule floor. According to Defendants, the vestibule floor was made of unglazed quarry tile and is not excessively slippery when wet. (Defs.' Answers to Interrogs. 22; Graf Dep. 69; White Dep. 23, Ex. E to Defs.' 56.1.)

In response to Defendants' motion, Plaintiff offered the opinion of Lloyd Sonenthal, a registered professional engineer, to address the composition of the vestibule tile. Sonenthal inspected the Defendants' store floor on October 27, 2010 and reviewed a number of photographs of the vestibule. (Letter from Sonenthal to Zavodnyik of 11/2/10 (hereinafter, "Sonenthal Initial Report"), at 1-2, Ex. B to Pl.'s Mem in Opp. to Def.'s Mot. to Strike.) Sonenthal observed a broken tile in the vestibule "reminiscent of the flaking of flint rock or flaking of strong, thick glass," but noted that the floor was otherwise "without blemish," "smooth" and "stone-like." (*Id.* at 4.) Sonenthal also measured the "dry coefficient of friction" on four vestibule tiles, which he defined as the "ratio of the horizontal force necessary to pull something along a surface, divided by the weight of the 'something' being pulled." (Letter from Sonenthal to Zavodnyik of 1/14/11 (hereinafter, "Sonenthal Supp. Report"), at 4, Ex. D to Pl.'s Mem. in Opp. to Def.'s Mot. to Strike.) In order to measure the dry coefficient of friction, Sonenthal used a "push-pull gauge and sabot," a method Sonenthal claims is similar to the method set forth in the American Society for Testing and Materials (ASTM) C-1028-26, *Standard Test for Determining the Static Coefficient of Friction of Ceramic Tile and Other Like Surfaces by the Horizontal Dynamometer Pull-Meter Method* (1996)."[3] (Sonenthal Initial

---

[2] Though Plaintiff initially offered several bases for Defendants' liability, she narrowed the gravamen of her complaint to focus on the excessively slippery nature of the tile floor in response to Defendants' motion for summary judgment.

[3] The ASTM publishes voluntary consensus standards in a variety of industries,
(continued...)

Report at 4; Sonenthal Supp. Report at 3.)  According to Sonenthal, unglazed quarry tile often has a rough surface with a 0.6 dry coefficient of friction, whereas the tiles he tested in the vestibule of the GFS Marketplace Store were smooth and had a dry coefficient of friction between 0.3 and 0.45, presumably indicating that the surface was more slippery.  (Sonenthal Initial Report at 3-4.)  After observing and testing the tiles, Sonenthal reviewed various articles on the best practices for treating slippery floors and reviewed the technical literature on the Internet regarding unglazed quarry tile.[4]  (*Id.* at 2.)  Sonenthal concluded that the vestibule tile is a "more likely [that of] a commercial grade porcelain" rather than unglazed quarry tile, did not appear to be "slip resistant" and will be "unsafe and slippery when wet." (*Id.* at 4-5; 8.)

In a supplemental report, which purports to clarify the findings in Sonenthal's first letter, Sonenthal explained that he never planned to measure the dry coefficient of friction and did not measure it with precision, but rather used the push-pull gauge to make "rough measurements" and merely to add "one more piece of data to . . . the growing body of data suggesting that [the tile] was not unglazed quarry tile."  (Sonenthal Supp. Report at 3, 5.)  Sonenthal's supplemental report states, further, that once he believed the tile to be porcelain, "the technical literature told [him] it was slippery when wet."  (*Id.* at 3.)

According to Plaintiff, Sonenthal's report shows that her fall was caused by Defendants' use of "substandard tile" for the vestibule floor that became slippery when wet.  (Pl.'s Mem. in Opp. to

---

[3](...continued)
including engineering.  ASTM C-1028-6 has been supplanted by the American National Standards Institute (ANSI) B101.1, *Test Method for Measuring the Wet SCOF of Common Hard-Surface Floor Materials* (2009).  Sonenthal claims that he did not use either ASTM "standard specimens" or the updated ANSI method in his assessment of the GFS store floor because the "coefficient of friction . . . is an immutable scientific principle," and thus, "[n]o ASTM or ANSI standard is necessary." (Sonenthal Initial Report at 4; Sonenthal Supp. Report at 4.)

[4] Sonenthal lists various articles he consulted such as George Sotter's "Slip Fall Prevention Technology Moves Ahead," but he does not specify what Internet sources he used. (Sonenthal Initial Report at 2.)

Def.'s Mot. to Strike. at 2.)  Plaintiff argues that her fall was also caused by Defendants' negligent placement of the mat near the vestibule entryway.  (*Id.* at 2.)  Defendants have moved to strike Sonenthal's report on the grounds that it fails to satisfy the standards set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589 (1993).  Defendants argue that Sonenthal's opinions are not reliable because there is no support for his conclusion that the store's floor is unsafe and may be slippery when wet.  (Mot. to Strike at 1-2.)

## **DISCUSSION**

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  When ruling on a summary judgment motion, the court will draw all justifiable inferences in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The court will not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Still, "[o]nce a party has made a properly-supported motion for summary judgment, the nonmoving party must submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'"  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting FED. R. CIV. P. 56(e)).  No genuine dispute exists "if the evidence presented . . . is of insufficient caliber or quantity to allow a rational finder of fact to find [for the opposing party]."  *Anderson*, 477 U.S. at 254.  Indeed, "[i]nferences that are supported by only conjecture or speculation will not defeat a summary judgment motion."  *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004).

### **I.    Admissibility of Expert Testimony**

Defendants argue that Sonenthal's methodology formed an unreliable basis for his conclusions about the composition of the tile surface and its corresponding slip-resistance. Specifically, Defendants assert, Sonenthal did not take any measurements to determine the wet coefficient of friction of the vestibule tile surface, and therefore, failed to establish how the surface

6

is excessively slippery when wet. The admission of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Daubert* requires the trial court to serve as "gatekeeper," screening proposed expert testimony for relevance and reliability. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The trial court must therefore determine: (1) whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education," (2) whether the subject of an expert's testimony involves "scientific knowledge," and (3) whether the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (quoting FED. R. EVID. 702); *Myers v. Illinois Central R. Co.*, 629 F.3d 639 (7th Cir. 2010). In order for an expert's testimony to qualify as within the realm of "scientific knowledge," the proposed "inference or assertion must be derived by the scientific method." *Daubert*, 509 U.S. at 590. In other words, the "proposed testimony must be supported by . . . more than subject belief or unsupported speculation . . . ." *Id.*; *see also Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152) ("The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field.")

In this case, the court is not satisfied that Sonenthal's report presents a reliable basis supporting his conclusion that the vestibule floor was excessively slippery or unsafe. In his initial report, Sonenthal states that Defendants "permitted the vestibule to be fabricated of smooth ceramic or porcelain tile, without abrasive surfacing, texturing or other appropriate means to render the surface slip resistant . . . [and knew] the surface would be unsafe and slippery if wet . . . ." (Sonenthal Initial Report at 2.) In reaching this conclusion, Sonenthal admits that he made only a "visual assessment" of the vestibule tile, conducted an informal test of the coefficient of friction using a push-pull gauge on a dry portion of the vestibule tile, and reviewed certain technical literature regarding slip prevention. (*Id.* at 2.) His estimates of the store's dry coefficient of friction are indeed lower than would reportedly be expected for unglazed quarry tile; according to

7

Sonenthal, "the literature" suggests unglazed quarry tile has a dry coefficient of friction of 0.6 "for most brands," whereas the tiles he tested in the vestibule of the GFS Marketplace Store had a dry coefficient of friction between 0.3 and 0.45.[5] (*Id.* at 4.) Yet Sonenthal concedes in his supplementary report that he only made "rough measurements" during his site visit because he "did not have the device necessary to measure [the] wet coefficient of friction as suggested by the ANSI standard," and "more precise data" obtained in a laboratory setting is needed to establish the exact composition of the tile. (Sonenthal Supp. Report at 2; 6.)

Reading the two reports in conjunction, it appears that Sonenthal could not conclusively determine the composition of the floor tile. Defendants have asserted that the floor was in fact composed of unglazed quarry tile, and neither of Sonenthal's reports effectively refutes that assertion. But even if the vestibule floor is in fact made of porcelain and becomes slippery when wet, Sonenthal's speculation about the tile's safety is unhelpful because he does not clearly state that porcelain is improper material for a vestibule floor. At best, Sonenthal's measurements roughly calculate the level of friction on a dry portion of the vestibule tile, but do little to assist the court in "understand[ing] the evidence or determin[ing] a fact in issue" as required by Federal Rule of Evidence 702. *See, e.g.*, *LG Electronics v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3613814, *9 (N.D.Ill. Sept. 3, 2010) (excluding portion of expert's opinion on conventional dryers as unsupported where only steam dryers were analyzed). The central question here is not whether the vestibule floor was slippery, but whether it was excessively slippery as Plaintiff suggests. The court accordingly grants Defendants' motion to strike Sonenthal's expert report.

**II.     Natural Accumulation Rule**

---

[5] As Defendants point out, even Sonenthal's estimates of the dry coefficient are vague because he does not identify any standard coefficient of friction beyond which a floor is considered slip resistant. Further, Sonenthal does not identify the source of the technical literature that describes what he claims is the typical dry coefficient of friction for unglazed quarry tile. (Def.'s Mot. to Strike at 9.)

Defendants contend that they are entitled to summary judgment because the evidence shows Plaintiff's fall was not caused by an unnatural accumulation of water; rather, her fall was the result of rainwater on the vestibule floor that was likely tracked in by other customers. In Illinois, business owners are not held liable for injuries caused by natural accumulations of "ice, snow, or water that is tracked inside the premises from the outside." *Reed v. Galaxy Holdings, Inc.*, 394 Ill. App. 3d 39, 42, 914 N.E.2d 632, 636 (1st Dist. 2009) *and cases cited therein*. As a result, store operators have no duty to remove the "tracks or residue left inside the building by customers who have walked through natural accumulations outside the building," and "have no duty to warn of such conditions." *Id.* at 42-43, 914 N.E. 2d at 636 (citing *Roberson v. J.C. Penney Co.*, 251 Ill. App. 3d 523, 526, 623 N.E.2d 364, 366 (3rd Dist. 1993) and *Walker v. Chicago Transit Authority*, 92 Ill. App. 3d 120, 123, 416 N.E.2d 10, 13 (1980)).

Plaintiff insists that Defendants remain liable even if the water that was present at the time of the fall was a natural accumulation, because Defendants' use of substandard tile near the store entrance and negligent placement of the mat near the entryway created an unreasonably dangerous condition. (Pl.'s Mem. in Opp. to Def.'s Mot. for Summ. J. at 2.) Plaintiff is correct that a property owner may be held liable for injuries if an unusual walking surface, defect in the premises, or certain flooring material causes an unnatural accumulation of water. *See, e.g.*, *Fanning v. LeMay*, 78 Ill. App. 2d 166, 173, 222 N.E.2d 815, 819 (5th Dist. 1966) (plaintiff sufficiently alleged that defendants knew asphalt tile in defendants' laundromat became dangerously slippery when wet), *rev'd in part on other grounds*, 38 Ill.2d 209, 230 N.E.2d 182 (Ill. 1967); *cf. Selby v. Danville Pepsi-Cola Bottling Co.*, 169 Ill. App. 3d 427, 436, 523 N.E.2d 697, 701 (4th Dist. 1988) (affirming dismissal of complaint where plaintiff failed to allege any defective construction materials were used in parking lot where plaintiff fell). In this case, however, apart from Lloyd Sonenthal's expert report (which the court has concluded is inadmissible), Plaintiff has offered no evidence to support her claim that the vestibule tile in the GFS store was particularly

9

slippery.

Plaintiff relies on *Fanning*, where the Illinois appellate court held that it was *possible* for a plaintiff to prove her negligence allegations, but the different procedural posture of that case renders it of little use here. A more analogous case is *Richter v. Burton Inv. Properties, Inc.*, 240 Ill. App. 3d 998, 999, 608 N.E.2d 1254, 1255 (2nd Dist. 1993), where a mail carrier slipped and fell on water in a ceramic tile foyer and alleged that the floor was excessively slippery. In affirming summary judgment for the defendant, the court in *Richter* distinguished *Fanning* as inapplicable at the summary judgment stage and emphasized that in order to defeat summary judgment, a plaintiff must "present evidence detailing why the foyer was excessively slippery." *Id.* at 783-84, 608 N.E.2d at 1257-58. The plaintiff in *Richter* had merely testified that the tile in the foyer was excessively slippery without providing any "evidentiary facts to support his allegations that [the] defendant either installed unreasonably slippery ceramic tile or maintained it in an excessively slippery condition." *Id.* at 784, 608 N.E. 2d at 1258. In the instant case, Plaintiff contests Defendants' assertion that the vestibule floor was unglazed quarry tile, but she has not established that the vestibule flooring was unsuitable, and has offered no other admissible basis for her assertion that the vestibule floor was excessively slippery.

The court is similarly unmoved by Plaintiff's allegation that Defendants' negligent placement of a mat inside the store vestibule contributed to her fall. In Illinois, the fact that a mat "becomes saturated in a store's entryway due to tracked-in water does not transform the water into an unnatural accumulation, nor does it aggravate the water's natural accumulation." *Roberson v. J.C. Penney Co.*, 251 Ill. App.3d 523, 528, 623 N.E.2d 364, 367 (3rd Dist. 1993) (citing *Wilson v. Gorski's Food Fair*, 196 Ill. App. 3d 612, 615, 554 N.E.2d 412, 415 (1st Dist. 1990)). Thus "[w]here an accumulation of water is a natural one, there is no duty to continue a voluntary undertaking to remove it." *Reed*, 394 Ill. App. 3d at 48, 914 N.E.2d at 641 (citing *Richter*, 240 Ill. App. 3d at 1005, 608 N.E.2d at 1259 (quotation omitted)). Plaintiff cites to ASTM F 1637, which provides that mats

may be used to control the spread of precipitation and should be used at known transitions between wet and dry surfaces.  According to Plaintiff, that standard created a duty on Defendants' part to place a mat directly abutting the door to the GFS store.  In a factually similar case, however, the Illinois appellate court held that a store had no duty to place any mats in the entryway to its store: in *Roberson*, defendant retailer had placed two mats in the entryway to its store, covering only a portion of the floor, and a customer slipped on snow and water that had been tracked into the store from the outside.  *Id.* at 525, 623 N.E.2d at 365.  The customer argued that the store failed to install an adequate number of mats to remove the water, but the court disagreed, and held that the defendant's voluntary use of mats gave rise to no duty beyond that of maintaining the mats with "reasonable care."  *Id.* at 526-27, 623 N.E.2d at 366.  Similarly here, Plaintiff has not argued that the mats in the vestibule area were defective or negligently maintained.  The fact that, according to Plaintiff, the mat did not directly abut the door, or that it slipped when Plaintiff fell, is no indication that Defendants did not reasonably maintain the mats.

In sum, the court concludes that Plaintiff has failed to show that the GFS store's floor was the result of an unnatural accumulation of water or that the floor was excessively slippery.  Accordingly, the court grants Defendants' motion for summary judgment on Plaintiff's negligence claim.

**CONCLUSION**

For the foregoing reasons, the court grants Defendant's motion to strike Plaintiff's expert report [30] and motion for summary judgment [18].

ENTER:

Dated: August 2, 2011

_____
REBECCA R. PALLMEYER
United States District Judge